The Royal Crown Company v. The Coca-Cola Company Royal Crown's opposition in this proceeding sought one thing, to have the Coca-Cola Company disclaim zero from 17 trademark applications for marks like Coke Zero, Sprite Zero, Fanta Zero, and thereby disclaim the exclusive right to use the term zero apart from the marks as a whole. We believe a disclaimer is mandated in this circumstance because zero, as used for zero-calorie soft drinks, cannot function as a mark. Either the term is generic or, if it is instead merely descriptive, there is a lack of evidence showing that it signifies the Coca-Cola Company exclusively. We believe the Board made errors in deciding both of the issues that we raised below. Would we have to decide the genericness question actually decided if we agreed with you about the inadequacy of proof or at least inadequacy of Board's reasoning on acquired distinctiveness? This Court has previously taken the position that if you don't have acquired distinctiveness, that's sufficient. I believe it was the Louisiana fish fry product case where the Court decided that there wasn't sufficient evidence of acquired distinctiveness. The Court didn't reach the issue of genericism, and I think Judge Newman in her concurring opinion said that the Court should have reached the issue of genericism, found that the Louisiana fish fry product portion of the mark was generic, and then not reached the issue of acquired distinctiveness. I think in fairness to the law, the Court should address the issue of genericism, even if it were to find that the Coca-Cola Company hadn't sufficiently showed acquired distinctiveness. Because genericism affects the required showing for acquired distinctiveness, correct? There's a couple of reasons, Your Honor. One, genericism is a little bit, I would say, more permanent than lack of acquired distinctiveness. In theory, if you don't have acquired distinctiveness today, there could be some situation a couple years, five years, 10 years, 20 years down the line where acquired distinctiveness could be shown. It's much harder to rescue a term from genericism, and I would suggest that probably a term couldn't be rescued from genericism. It also does affect what type of evidence is considered by the Court. As we argue in our brief, there's certain evidence that shouldn't be considered on genericism, namely the question of acquired distinctiveness. I hope I've answered your question. What would be the difference if there was a disclaimer of zero, but Coke Zero sought a combination mark as to its own individual marks? I'm not sure I understand your question, but the disclaimer works. You're disclaiming a portion of the mark, in this case the term zero. There's no question that Coke Zero, for example, should be registered. We just think the zero portion should be disclaimed. We believe that would affect what the Coca-Cola company could do with its marks down the line, how it could enforce them against third parties, as one example, and particularly relevant to our clients, Royal Crown and Dr. Pepper 7 Up. How would it affect their enforcement? Well, it's a little unclear because even though the Coca-Cola company has been claiming rights in zero since 2004, I believe there is an evidence in the record that they've gone after anyone except for two companies who have used zero in the marketplace, one being our client, Diet Right Pure Zero, and another being a company that distributed a product called Palmberry Zero. That's the only evidence in the record of demand letters that were sent, and both of those companies rejected the Coca-Cola's claims of rights in zero. So what the Coca-Cola company will do if and when it wins this appeal, who knows what it would do if it loses this appeal. We hope that it would finally understand that it can't enforce zero against third parties, and everyone in the industry, the Coca-Cola company, our client, PepsiCo, and the tens and dozens of other companies in this industry could have more freedom to feel like they could use zero comfortably. But again, we really don't know what the Coca-Cola company would do. So on the issue of genericism, there were two errors with the board. The first one we believe is that the board held Royal Crown to the wrong standard. The legal test enunciated by the Marvin Ginn Court is clear. The question is, is the term sought to be registered, understood by the relevant public, primarily to refer to the relevant genus of goods? And what the board did was hold Royal Crown to a different standard of showing that zero is the name of a category of goods. And this isn't just a question of semantics. This actually makes a real difference because case law from this court and others is clear that refer to a genus as used in the Marvin Ginn opinion and other courts means something broader than, and sometimes something different than, the name of a category. And as two examples from this court, we have the recent case of In Re Cordua restaurants where the term churrascos was deemed to be generic for restaurant services because the restaurant could serve churrascos, which is apparently a type of meat. And another case going back a few years, In Re Reed, where the phrase lawyers.com was held to be, or the term lawyers.com was held to be generic for a website featuring legal services because a key aspect of those services was to help users find lawyers. So those cases and others show that it doesn't have to be the name of a category. Lawyers.com is not the name of a category of websites, but it was still held to be generic. And the result of what this was, because the board held the Royal Crown to the wrong standard, it also discounted a large amount of evidence that did go to the issue of whether consumers understand zero to refer to a genus of goods, even if they don't use it as the name of a category of goods. So the genus of goods would be what? Sugar-free sodas or sodas generally? The genus of goods is, as this court has decreed and as the board decided, is what is in the Coca-Cola company's trademark applications. And those concern, there's some debate about the question of what does soft drinks mean, but it's soft drinks, syrups, and concentrates for making the same. Some of them also specified energy drinks, concentrate syrups, or sports drinks and concentrates and syrups. So the board was really looking at the question of, is zero generic for the genus of goods that includes soft drinks, energy drinks, and sports drinks? And of course, included in that is the subcategory of goods within that genus, which would be zero calorie beverages. And it's the same question that was at issue in the Henry Cordua restaurants case, where restaurants don't have to serve churascos. It ended up that the applicant's restaurants did serve churascos and I think called it a signature dish. But in the same way, even if zero isn't generic for the broad category of soft drinks, if it's generic for a subcategory within that here, the zero calorie soft drinks, then it would be generic for the whole genus and prevent the Coca-Cola company from claiming exclusive rights in that particular matter. What about the argument on the other side that even some soft drinks use zero when they don't really mean zero calories, they might mean zero something else like carbohydrates or... Well, I think that argument is a little bit overplayed by the other side because all of the soft drinks they offered under the zero name, excluding I think perhaps one, which may no longer be sold, did in fact have zero calories or at least listed zero calories on the label. And there's a certain federal drug regulation that as long as it has fewer than five calories per serving, you can put zero on the label. So the question is what do the consumers perceive the calorie content of the beverage to be, even if it may have one or two calories, what they perceive it to be and what the law allows the manufacturers to say is that the beverage in fact has zero calories. But that also raises a question that I think that was discussed in the Henry Cordua restaurants case, which is if the specification of goods in the Churrasco's application had excluded meat, for example, restaurant services excluding the service of Churrasco's meat, then would Churrasco's be generic for that specification of goods? And I believe the court's decision in that case said that in that case, the term Churrasco's might not be generic for that particular specification of goods. In this case, we don't have that issue. The calorie content of the beverage is zero calories in addition to other calorie beverages. And so that argument I don't think would change the decision. So on the genericness question, you all had the burden, right? And why could the board not find that your evidence just wasn't strong enough to show by a preponderance that zero was understood by consumers to refer to zero calorie products? It wasn't as strong as the board imagined it could be, in particular focusing on the absence of a consumer survey on your side, which doesn't mean that... So it's just kind of a failure of proof and no more. Well, I think there's two issues on that. One, I think that the failure of proofs that they said we had followed from holding us to the incorrect standard, right? They said that you have to prove that zero is the name of a category. And then they looked at the evidence and said, well, hardly any of this evidence shows that people use zero as the name of a category. But again, that's the incorrect standard. The correct standard is whether it refers to a genus. And there was plenty of evidence in the record. Where were the board's uses of the name? I know, I think it quoted or it stated it once. I guess I'm not remembering that it ever made anything of the distinction, which is a real distinction between name and refer to. Sure. If you look at pages, I believe 16, 17 of the decision, appendix 16 and 17, particularly on page 17 at the very bottom of the page, they equate the phrase refer to the genus of goods and service to the name of a category. And so they're talking about the third party use of zero in beverage names in addition to the Coca-Cola's use. And they say that the use is minor and compared to the Coca-Cola companies and therefore irrelevant. And then they public primarily uses or understands the term zero to refer to the genus of goods or services. And again, using the language, but then saying that is as the name of a category of sports drinks or energy drinks or soft drinks. So it's clear that what the board is doing here is they're equating that refer to a genus to mean name of a category. And we believe that was incorrect. And that led them to disregard or discount a large amount of evidence that the Royal Crown Company had put into the record that shows that consumers do, in fact, understand zero when used on beverages and in particular zero calorie beverages to mean zero calories. On page 13, though, they said TCCC's goods fall into the broad category of soft drinks and sports and energy drinks, which encompasses the narrower category of soft drinks containing minimal or no calories. So are you saying that's not what they were looking at on page 17 when they talked about what the genus of goods or services is? No, no, no. That's a completely different point. I think that the board looked at the proper genus. I think that what they did was they applied the wrong standard of law. They considered that the Marvin Ginn standard of refer to a genus means only the name of a category. And that was incorrect as a matter of law based on precedence of this court and, as I was saying, also caused them to disregard or discount a large amount of evidence that the Royal Crown Company had put in on the issue of genericism showing that consumers do, in fact, understand zero when used in connection with beverages to specify and to mean zero calories. So in response to Judge Toronto's point, though, I mean, as we said in Princeton Vanguard, the whole point is what the public perceives. Do you think that you had enough affirmative evidence in the record to establish that the public does perceive items with zero in the title as it refers to soft drinks to mean zero calorie soft drinks? Yes, we certainly do. And let me just go through some of that evidence, and including the evidence that the board discounted. One was the Coca-Cola Company's survey that it undertook before launching Coke Zero, which showed that nearly all respondents understood zero in a soft drink name to mean zero calories. The Coca-Cola Company's own product labels, advertising and press releases that told consumers over and over and over again that the key attribute of their product was zero, and that zero in the name referred to that zero calories. Dozens of examples of labels and nutritional panels from third-party products that show zero being used in reference to zero calories, thus conditioning consumers to understand that zero on a beverage refers to zero calories. Evidence of 32 soft drinks from companies other than the Coca-Cola Company that use zero in the brand name for zero calorie beverages, again, well, one, indicating to consumers that zero in a product name means zero calories, and also showing that the industry uses zero in a product name and otherwise to indicate a key aspect of beverages. And then also there were 69 third-party trademark applications and registrations that also use zero, again, showing that the industry uses zero to indicate a key aspect. There's also evidence – and that was evidence that the board disregarded because they didn't think it showed that consumers used zero as the name of a category. What was evidence? You just listed about seven or eight categories. I don't think the board disregarded all of that. Exactly. Basically, they gave reasons through their opinion why it wasn't relevant to the question of it being a name of a category. Some of the evidence they disregarded for other reasons, for example, the canceled and expired registrations that said weren't evidence of anything, that applications were evidence of nothing that they filed. But again, I would say on both of points that the character of the applications and registrations, their status doesn't matter to show what they were being used by for the industry. Let's hear from the other side. We'll save you some rebuttal. Thank you. Mr. Baber? Good morning, Your Honors. May it please the Court. I'm Bruce Baber, representing the Coca-Cola Company. I will respond in just a minute to some of the points Ms. Pop-Rosenberg just made, but I think it would be helpful to begin with just a few sort of big picture issues that I think help frame the issues before the Court. They help frame the Board's decision, and they help frame the evidence that was before the Board. As Your Honors know, there are two separate issues on this appeal, genericness or not, acquired distinctiveness, what we sometimes call secondary meaning, or not. Those issues are they both turn on consumer perception. How do consumers understand a term when they see it in the marketplace? Under the governing law, the burdens on those two issues before the Board in a proceeding like this are very different, but both are questions of fact for the Board to decide and therefore subject to review by this Court under the substantial evidence standard viewing the record as a whole. On genericness, the law really is not in dispute. This Court has said many times in the Marvin Ginn case, in Princeton Vanguard, it's a two-step analysis. First, you decide what's the genus. There's no dispute in this case. Ms. Pop-Rosenberg has confirmed again the genus is soft drinks, sports drinks, and energy drinks. I'm sorry, but the genus that this term could refer to is a subset of that. Do you agree that that subset is those items with zero calories, zero being the FDA meaning of zero? No, Your Honor. I would say, frankly, that's sort of a semantic trick to define it using the term zero. I think the Board got it right. The relevant subcategory, if you will, to look at to see whether or not zero has become the common descriptive name for it, which is the test under Marvin Ginn and Princeton Vanguard, is you look at products having minimal or no calories. That's what they argued, is that it's low-calorie products. Do you agree? I agree. That's the correct inquiry to ask. I don't think that's much different than what that's exactly what it is. I apologize, Your Honor. It doesn't have to be zero calories, for example. It could be low-calorie, minimal calories, which are the words that the Board used. Yes, we're looking at, in effect, candidly, the diet category of drinks. That's what they're more generally known as. I'll come back to diet in a few minutes. Under the generic, this issue— So, your colleague on the other side recited seven or eight classes of evidence which point in the direction of the term zero all by itself when used in this soft drink category. I'm going to use soft drink as a shorthand. It's understood by consumers and by those who have a financial interest in speaking clearly to consumers, namely other marketers, to refer to what the thing is, not who is selling it. Why was that evidence not, essentially, sufficiently strong that it was reversible for the Board to conclude otherwise? What the Board looked at, Your Honor—and they took the evidence category by category, as R.C. tendered it. They're brief below. They put them all in these different boxes. The Board correctly realized, first of all, you start at the high level. The Board looks at genericness issues all the time, and it's guided by this court, which said— Can you talk about the evidence, not the wonderfully good faith regular process of the Board? I will assume all of that. None of those categories of evidence provided any probative evidence as to what consumers thought. There was no consumer evidence. There was a tiny bit, and the Board went through it in tedious order. It's not direct evidence, but it is evidence. Then there's all these other usages that they describe—the fact that you all never use zero by itself, but always with a recognizable brand name. Why is that evidence not strong enough to compel the conclusion? Because, Your Honor, you have to consider all the evidence. I mentioned earlier, both genericness and secondary meaning are driven by consumer understanding. Part of the evidence in this case is a consumer survey. That was not relied on by the Board in the genericness context. They did not, Your Honor. You're correct. But the Board was also aware of the substantial sales by the Coca-Cola Company and the advertising by the Coca-Cola Company, which it then turned to, specifically on secondary meaning. But the Board was aware of that. It saw all the evidence. What do you do with the long line of cases, which is surely both sound and important, that says, if you have a term that consumers understand to refer to what the thing is, not who sells it, the first big company can't monopolize it? Even though the answer to the survey question, and I'm now importing this, do you associate it with the company would be, of course, yes. That still wouldn't, in fact, tell you that they understand it to refer to who is selling it rather than what it is. Absolutely, Your Honor. That's more directly relevant to secondary meaning. But on the first issue, the evidence you want to talk about, first of all, the Board did not exclude any of the evidence. The Board weighed all that evidence and considered it. It said in a series of footnotes and analysis in its opinion why it felt like that evidence was not sufficient to show what consumers understood. But there was a little bit of a disconnect in the sense that the Board was sort of checking off pieces of this one standing alone isn't good enough and this one standing alone isn't good enough. There was never any assessment of saying, but when you put all of it together, we might come up with a different view. Well, there was, Your Honor, I think in this respect. The Board focused very carefully on what it identified as the 17 instances of what really looked, some of them looked, more like something like a generic use. For a generic use, and I disagree with Ms. Pop Rosenberg that the Board somehow got the law wrong. I mean, the Board said over and over again it was applying the Marvin Ginn standard. That means what did refer to some group of goods. Right, but as we said in Princeton Vanguard, you're supposed to be looking at the mark as a whole. In that case, pretzel was disclaimed. Here you've got the Board basically saying you have to tell us that zero in and of itself standing alone without any soft drink name in front of it is generic. But I don't think that's the correct standard, is it? Your Honor, what R.C. had the burden of proving is that there was sufficient evidence to show by a preponderance of the evidence that when consumers see a phrase like zero drinks, zero sodas, zero beverages, that they know what that means, and they know that that's a group of things, it's a class of goods or services. That's the first part of the, whether it's Marvin Ginn, whether it's Princeton Vanguard, a generic term is the common descriptive name of a class of goods or services. And so that's what R.C. scoured the internet to find any references they could find anywhere to zero drinks or zero sodas. But when you put a soft drink bottler's name in front of the then the question is, do you affiliate that with zero calorie soft drinks? And as we said in Princeton Vanguard, you can't separate. If you want both points in the mark and you're not going to disclaim either one, you have to take them together. So the mere fact that zero might not always talk about soft drinks is a different inquiry than whether zero combined with a soft drink manufacturer's name talks about soft drinks. I think the issue, to put that issue in the framework for this case, Your Honor, the question would be, okay, if someone saw, if someone who had never seen any advertising or any promotion, if they saw a product named Coca-Cola Zero, would they know what that means? What does that zero refer to? Does it tell them something about the product? And I would encourage the court to look at the testimony of Coca-Cola's Russell Baker. He testified that when the Coca-Cola company launched these products, part of the problem, frankly, was consumers didn't know what the zero meant. They just didn't know. We have evidence in the record that R.C. on its products. But that wasn't the date in which you're seeking the mark. You're seeking the mark now when the use of the word zero is fairly prolific. They do. And what consumers have come to understand the term to mean, which is what we know from the consumer survey we did, is that when you see a zero on a soda, well, that's one of those Coca-Cola products. I don't think the survey does show that. It just says the answer. The only interesting question in that tiny survey is, do you associate that with? It seems to me, you know, for more than a decade, several decades, the answer to that question for, say, photocopiers would be, yes, I do associate photocopiers with Xerox or, you know, instant cameras. Yes, I do associate it with Polaroid. It seems to me that would tell you almost nothing about whether photocopier is not generic or instant camera is not generic. This is all part of this line of cases that says when you have a term that people understand to refer to the thing, the first gigantic user can't monopolize it. Don't disagree with that, Your Honor. If the evidence showed that that's how consumers understand... Right, I guess let me just focus on this question. It seems to me this question, do you associate, doesn't make the crucial distinction. Well, do you associate, then don't get me wrong, Your Honor. That was specifically, there are in the survey world and trademarks, there are well-known protocols for how to do different types of surveys. They may be well-known. They may not actually be good for the legal question. Well, the point I was going to make, Your Honor, is that what we ran was a secondary meaning survey, clearly. It's what's called a Palladino survey. It is designed to test and to match up with the court's case law that when a term is associated with the products of a single company, that's a showing of acquired... But they didn't ask if it was associated with anything else. They just said, do you associate it with this, with X? They didn't say, would you also associate it with Y, or would you also associate it with Z? And that's the methodology, Your Honor, is you rotate the questions and you say, do you associate soft drinks with zero in their name with products of one company or products of many companies? That's how you ask some people. Other people, you ask reverse. You ask many first and then one to not have order bias. And in this case, we got over 50% results of people saying they associated it with products of one company. We asked what company, and they said the Coca-Cola Sprite, et cetera. That's separate and apart. That's on secondary meaning. What we don't have, and what would go to Your Honor's question, Judge Taranto, is we don't have a Teflon survey. A Teflon survey is one that the proponent of genericness generally runs to test whether consumers understand the term to be a generic term. Again, there's a methodology for that. You put people and you give them a questionnaire and you say, I'm going to explain to you the difference between a generic term and a brand name. Let me give you some examples. Do you understand? Yes, I do. You ask a test question to be sure they get it right. And then you would ask, do you understand zero or zero drinks to be a generic term for soft drinks having so-and-so calories, or do you understand it to be... So for purposes of deciding genericness, we can and presumably should do what the board did, which is ignore your Simonson survey. You don't need to get to the Simonson survey to rule correctly. Well, we can't because it wasn't a genericness survey. Well, you could though. If this board were to do a de novo review of all the evidence, which is not the task, obviously it's a substantial evidence test, but there's a lot of... If you read Professor McCarthy's treatise, for example, he would tell you, and I think it makes intuitive sense, if you're trying to decide, okay, does the evidence persuade me that what this term means to consumers is a common descriptive term of a category? Well, if I have evidence over here that shows more than 50% of people think it comes from only one source, that weighs against genericness. I'm sorry. The evidence says that maybe more than 50% associate it with that. That doesn't seem to me to tell you that more than 50% think that it comes from that source. The question of association is incredibly loose. Don't tell me everybody does it. I'm trying to understand why if maybe everybody's doing the wrong thing. No. Well, secondary meaning, of course, back up. The survey, yes, we did a standard secondary meaning survey, but we also had evidence, frankly, of the traditional ways of proving secondary meaning, which is advertising, marketing span, advertising the products together to show that all these products have zero in the name, they all come from us. Those are traditional ways, and we had that in spades, obviously. We're a large company. We had tremendous sales numbers. You have them in the record. We had tremendous advertising expenditures, and that was just by us. That wasn't even by our bottlers or their customers who actually advertised at the grocery store level. So you have massive amounts of advertising, right? And the courts have recognized since time immemorial that a strong showing of secondary meaning is one that shows significant sales and significant advertising and promotion. There's no doubt you can get a mark on Coke Zero. If you ever intend to keep making it, which we understand you don't, but at least my law clerks say you don't. So there's no doubt you can get a mark on Coke Zero. The question is whether you can bar others from using the term zero. That's not an issue on these proceedings, Your Honor. Coca-Cola Company has never attempted to bar anyone from using zero, especially in any descriptive way. Are you saying that your friend on the other side was wrong when she said there were that was sent years ago to a product I don't believe is sold anymore? But the record is replete. This actually came up before the board. There are all these uses that are out there, many of the ones they point to. Well, if you don't care, why don't you just disclaim zero and that it wouldn't even be much of an issue at all? Because, Your Honor, we are entitled to a registration without zero. If they didn't prove genericness, if they chose not to put in a survey, we don't know whether they ran one and it didn't work, or they just chose not to do it, they didn't carry their burden on genericness. We believe we did carry our burden on acquired distinctiveness, and with those two outcomes, we are entitled to registration without disclaimers. What if we disagree on genericness? Then where do you stand on acquired distinctiveness? Well, it depends on what you do, Your Honor. If you disagree on genericness and you send it back to the board for some further analysis of some kind, then I guess you decide whether you just want to wait and make a ruling on acquired distinctiveness later or not. But until there's a final... But there would have to be a re-weighing of acquired distinctiveness if we concluded that the mark was generic. If you concluded, Your Honor, that the mark was generic, if you made, you didn't remand it for redetermination, you just decided it was generic based on the thin evidence they presented, then it's game over. If you say it's generic, then there can be no acquired distinctiveness. That's absolutely the case. That's always been the law. So that's why I think it's important, as Judge Newman suggested in her concurrence in the case... Louisiana Fish Farm. Louisiana Fish Farm. Exactly, Your Honor. You do have to look at genericness first. You look at all these other cases that the court's familiar with. You've had dictionary definitions. You've had articles, New York Times, Los Angeles Times, trade journals, using all these terms as generic terms when things have been held generic. That's exactly what we don't have here. We don't have any dictionary definitions of zero drinks, zero beverages. I asked the witnesses from both our side and their side, have you ever seen any industry publication even in the soft drink business that had a category or referred to a group of zero drinks? No, never seen it. They're just part of a diet. Can I pick up on a question Judge O'Malley asked a while ago? I'm interested in your view. I took her to be suggesting that the question of genericness of zero should be asked and answered about understanding when consumers see it, not all by itself, but when they see it as part of a set of words, a combination, which has an immediately recognized brand name in front of it. I wasn't quite sure what your position was. At least once you said what they had to come in and show was that when people saw zero all by itself, they knew what it meant. At least the question that I was understanding being asked was, maybe that's really not the right question, but how do they understand zero when they see Coke zero, Fanta zero, Sprite zero? I think you're right, Your Honor. Let me answer it two ways. For purposes of the genericness determination, there has to be some identification of what you think the thing is the common descriptive name for. In that sense, like any other adjective that somebody argues about whether it's generic or not, footlong, brick oven, kettle for chips, light for beer. Light for beer is a great example. You have to put it in context. You have to give it a noun. We don't dispute. Clearly, adjectives can be generic terms like light and like footlong. You ask the genericness inquiry that way. As part of the proof, you'll get the proof. Which way? With the other word attached to it? Yes, with light. I'm sorry. I said light. Zero. You have to give it a noun. Zero drinks, zero beverages, zero soft drinks. No, no, no, no, no. I understood the question to be, do you ask it in the context when it's Sprite zero, Coke zero, Fanta zero? That's exactly the question. Because obviously zero, just zero in the abstract, you can't do any analysis. If it's a dictionary word, it means nothing in some category. Zero when combined with a self-evidently undisputed brand word, not another common descriptor like beverage. For a soft drink. That's what puts it in context for this case, which is when a consumer sees Sprite zero, do they say to themselves, oh, that's part of the diet category. That's really a diet drink. Or do they say to themselves, oh, Sprite zero. Coke is the one that makes all those zero products. I know Fanta zero. I know Coke zero. This comes from the same source. That's the question. And the question is, did they prove the former by a preponderance of the evidence with no direct evidence and no survey where they had the burden? And did we prove the latter where we did have a survey and we had lots of evidence, but we had the burden? So let me ask the question in terms of the copier example. And I will assume more from memory of youth that there was a long period when Xerox owned the copier world. Everybody would have answered the question, I see a copier, where does it or see the term copier? Where does it come from? They would have said Xerox, right? And Xerox fought like crazy to make sure that its name didn't become generic. I don't. Anyway, why is what you just said? Would that not have been equally applicable there? I guess I begin to doubt whether that's quite the right question, whether everybody would have understood that's where it must come from. I think to answer that question, Your Honor, you'd have to see exactly what the evidence was in that photocopier case, right? Here, the consumers were asked. And the beauty of our survey in some respects is, of course, they've argued for a long time, well, Xerox is just a new diet. It's the equivalent of diet. Well, that's exactly what we tested, right? We asked consumers, do you believe that products with Xerox in their name come from one source or more than one source? They said one. But when we asked about diet, over 90% of people correctly recognized, oh no, diet products come from all kinds of places, all different people. It was 92% of the respondents said, diet, it is a generic. Well, clearly it has no secondary meaning for anybody. It wasn't testing genericness, but it clearly was not a term that people thought came from one source. And zero, our survey showed, clearly was a term that the majority of people thought came from one source. And just on an issue that I know has gotten a little bit of airplay in the briefs, but on secondary meaning, for example, there is no requirement. It has to be over 50%. I know RC quibbles with some of the data from the survey, but it's long been the law. The secondary meaning survey that shows association in the 30s and 40% range, going all the way back, I think, to the Owens Corning fiberglass, pink fiberglass case, the survey showed 41 and 50%. That was good enough for this court. So when you get over 50% in a survey of secondary meaning, the courts, the commentators, Professor McCarthy, have always said that is clearly sufficient to show acquired distinctiveness. Especially when that's on top of very substantial sales and very substantial advertising. So I think the board's result in this case, the board was extremely careful. The board wedded itself to the Princeton Vanguard decision in terms of how to analyze the issues. The board went through the evidence category by category and explained why it felt that RC did not carry its burden. It chose not to do a survey. That's the preferred method of proving genericness as was reaffirmed in Princeton Vanguard. They just didn't do it. They're the third biggest software company in America. So you've got to ask why. But the board saw the evidence. They said RC fell short in proving that it was a generic term, but Coca-Cola carried its burden of showing that it had acquired secondary meaning. And based on those two, I think there's clearly substantial evidence to support both of those conclusions. The board didn't get the law wrong. The board got the law right. And under the substantial evidence standard of review, we ask the court to affirm. Thank you, Mr. Baber. Ms. Rosenberg, you have a few minutes for rebuttal. Thank you. I want to address a couple of points that Mr. Baber made. First, with regard to the survey, I know he criticized us for not putting in a survey. There's no requirement that we're required to put in a survey. Certainly, there are amounts of evidence that we think show that zero is generic as referred to a genus of goods. But you can't disagree that we have said repeatedly that it's the preferred approach. No, I don't disagree. You have said that. You've also never said that it's a requirement. But the survey didn't go on to genericness, right? It dealt with acquired distinctiveness. And then Mr. Baber said that we quibble with some of the results. I think the evidence shows that the results are much lower than the 51% or 55% they claim. And there's other issues with the survey as well. One is that it was undertaken in 2008. The trial was held in 2014, I believe. So six years difference. And during that time, there are many zero-name products that went on the market. And that goes to the question of did the Coca-Cola company truly prove acquired distinctiveness? And we think the board made an error. I'm sorry, just the relevant date as of which they had to have acquired distinctiveness? At the time of the trial. Time of the trial. Right. And so at the time of the trial, we think the board weighed the evidence wrong. We put in evidence showing that 32 other beverages made by companies other than the Coca-Cola company were on the market. The board looked at that and said, their sales are so small and inconsequential that it doesn't matter. The Coca-Cola company's use is still substantially exclusive. We think that by doing that, they stretch substantially exclusive use to beyond any permissible bounds. And I'd say in that respect, that the sales of these third-party beverages were not inconsequential. Our own Diet Right Zero product, which was put on the market a few weeks after the Coke Zero product. So it's been on the market since 2004. Testimony showed that it was distributed in 25,000 retail outlets across the United States in the five-year period leading up to the trial. It sold the equivalent of 1.8 billion 12-ounce cans of product. That is not an inconsequential product. Add to that 31 other products, including products from industry leaders, such as PepsiCo. Comparatively speaking, that's a drop in the bucket, isn't it? And why wouldn't the inquiry be, as an evidentiary matter, a comparative one? That if, I don't know, 98% of all of the uses of this were theirs, that actually matters for genericness. Well, I think that there's... Well, first of all, we're talking about acquired distinctiveness and not on genericness. On acquired distinctiveness, I think... But I'm sorry. I thought that virtually the only thing on genericness that the board said weighed on the other side was the staggering volume of their sales. That's true. And I think that was incorrect. We cited, I think, 18 cases, including seven from this court, saying that on genericness, acquired distinctiveness cannot save a generic mark. So we think on the genericness question that the board was incorrect to weigh any acquired distinctiveness evidence. And then on the acquired distinctiveness side, on the descriptive side, we think how the board weighed the evidence was wrong because as the court said in juice generation, the evidence of so many third parties out there is powerful on its face. And beyond that, we also put in evidence of our own sales, of PepsiCo sales, again, totaling in the hundreds of millions of dollars of product for a product sold nationwide and for several other companies as well. That could propel zero. Yes, propel zero. So we think that the board also erred in weighing the evidence on acquired distinctiveness to show that the Coca-Cola company had zero distinctive. And I would also say that the other error on the court's weighing of acquired distinctiveness had to do with the fact that what it focused on was the evidence of the mark being used as a whole. The sales information were all for Coke zero, Sprite zero. Advertising information for the whole marks, press mentions for the whole marks. As Judge Tarantino noted before, there's no evidence that Coke has ever used zero standing alone. And in the Louisiana fish fry products case, this court said that evidence that for the entire mark may not be sufficient to show acquired distinctiveness in a particular term. And we think that's particularly true in this case when there were 32 other beverages on the market that also had zero in the name. Thank you for your time today. Okay, thank you. Thank you both. The case is taken under submission.